IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN O'BRIEN, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 14-4776 |
| | : | |
| FIFTH THIRD MORTGAGE COMPANY, | : | |
| a division of FIFTH THIRD BANKCORP, | : | |
| Defendant. | : | |

**Jones, II      J.**                                                                                      **May 13, 2015**

## MEMORANDUM

John O'Brien ("Plaintiff"), a former employee of the Fifth Third Mortgage Company, a division of Fifth Third Bankcorp. ("Defendant"), is suing Defendant for failure to pay Plaintiff under Defendant's severance policy ("the Severance Policy") in violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 et seq. (Count I) and in breach of contract (Count II). (Dkt No. 1, Complaint [hereinafter Compl.].)

Defendant filed a Motion, Brief, and Statement of Undisputed Material Facts in support of summary judgment on all counts. (Dkt Nos. 28, 28-1, 28-2, Def.'s Mot. for Summary Judgment, Def.'s Brief in Support of Mot. for Summary Judgment, Def.'s Statement of Undisputed Material Facts [hereinafter MSJ, MSJ Br., Def. SOF].) Defendant argues that the Severance Policy was not an enforceable contract and, in the alternative, even if the Severance Policy was an enforceable contract, Plaintiff resigned independently and thus is not eligible for the benefits under the Severance Policy.

After a thorough review of the record, including Defendant's Motion and its attendant briefings, Plaintiff's Response Brief, Response to Statement of Facts, and Counter-Statement of Facts, (Dkt Nos. 34-5, 34-3, 34-4 [hereinafter Pl. Resp., Pl. Resp. to Def. SOF, Pl. SOF]),

1

Defendant's Response to Plaintiff's Counter-Statement of Facts, (Dkt No. 36 [hereinafter Def. Resp. to Pl. SOF]), and Defendant's Reply Brief, (Dkt No. 39 [hereinafter Def. Rep.]), it is hereby ORDERED that Defendant's Motion is GRANTED for the reasons set forth herein.

## I.    Standard of Law

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.

Under Fed. R. Civ. P. 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning they concern facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. A dispute is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson*, 477 U.S. at 248. In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Seigel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## II.    Factual Background

The Court recites the undisputed, material facts as viewed in the light most favorable to

2

Plaintiff. The Court further notes where salient facts remain disputed.

### a. The Parties

Defendant is a U.S. regional banking corporation, headquartered in Cincinnati, Ohio. (Def. SOF ¶ 1; Pl. Resp. to Def. SOF  ¶ 1.) Plaintiff began working for Defendant around August 2008 as Vice President, Wholesale Regional Sales Manager for the Northeast Region ("RSM"). (Dkt No. 28, Ex. A, John O'Brien Deposition, 12:4-10, Jan. 15, 2015 [hereinafter O'Brien Dep.]; Def. SOF ¶ 2; Pl. Resp. to Def. SOF ¶ 2; Pl. SOF ¶ 1; Def. Resp. to Pl. SOF  ¶ 1.) As a RSM, Plaintiff was involved in all aspects of the mortgage wholesale business. (O'Brien Dep. 53:14-54:6, 54:15-25; Pl. SOF ¶ 2; Def. Resp. to Pl. SOF  ¶ 2.) The majority of Plaintiff's annual compensation came from commissions on the loans closed by his Account Executives, through the mortgage brokers, and funded by Defendant. (Dkt No. 34, Ex. P, Commission Reports at DEF314-16; O'Brien Dep. 56:1-6; Pl. SOF ¶¶ 4, 55, 65; Def. Resp. to Pl. SOF ¶¶ 4, 55, 65.) As of March 10, 2014, Plaintiff supervised seven Account Executives. (Dkt No. 34, Ex. F, Def.'s Supplemental Responses and Objections to Pl.'s First Set of Interrogatories ¶ 5 [hereinafter Def. Inter. Resp.]; Pl. SOF ¶ 24; Def. Resp. to Pl. SOF ¶ 24.)

### b. The Severance Policy

Defendant created an Employee Policy Manual. (Dkt No. 28, Ex. D, Policy Manual at 1 [hereinafter Policy Manual]; Pl. SOF ¶ 7; Def. Resp. to Pl. SOF ¶ 7.) Plaintiff received and acknowledged Defendant's Employee Policy Manual ("Policy Manual") every year of his employment from 2008 to 2014. (O'Brien Dep. 13:1-6, 14:16-20, 19:5-9; Def. SOF ¶ 7; Pl. Resp. to Def. SOF ¶ 7; Pl. SOF ¶ 8; Def. Resp. to Pl. SOF ¶ 8.) Defendant's Policy Manual, with policies updated as of October 1, 2014, provided the following Introduction to the Manual:

> This Employee Policy Manual contains key Human Resources and related policies with which you and every Fifth Third Bank employee should be familiar. It does not, however, contain every Fifth Third Bank policy, nor is it intended to

3

be a comprehensive manual of everything an employee should know about Fifth Third Bank.

This manual contains an index of additional policies and places to find information regarding many topics of interest to Fifth Third employees. You may access the policies contained in this Policy Manual, as well as all other Fifth Third Bank policies, online any time via Fifth Third Bank's Employee Center at *Resources/Policy Center/Search the Policy Center.*

****

This Policy Manual is provided for information purposes only. The policies and procedures in this policy manual are designed to serve as guidelines for management action. They are not intended to create any contract or binding agreement between Fifth Third Bank and any employee. All policies and procedures outlined in this Policy Manual are subject to change at Fifth Third's discretion at any time, with or without notice.

(Policy Manual at 1; Def. SOF ¶ 10; Pl. Resp. to Def. SOF ¶ 10.) Of particular note, the Policy

notifies employees that additional policies may be available at the online Employee Policy

Center. (Policy Manual at 1; Pl. SOF ¶¶ 11-12; Def. Resp. to Pl. SOF ¶¶ 11-12.)

Defendant's Severance Policy is not contained in the Policy Manual. (*Compare* Dkt No.

28, Ex. F, October 2012 Severance Policy[1] [hereinafter Severance Policy] *with* Policy Manual at

1; Def. SOF ¶ 13; Pl. Resp. to Def. SOF ¶ 13.) Rather, the Severance Policy is contained in

Defendant's online Employee Policy Center and is accessible to all employees. (Dkt No. 28, Ex.

E, Fifth Third Bank Policy Center Online Screenshots at DEF223-26 [hereinafter Online

Screenshots]; Dkt No. 28, Ex. C, Meaghan Ruehl Deposition 11:12-19, Jan. 13, 2014 [hereinafter

---

[1] Plaintiff attached the October 2012 version of the Severance Policy to his Complaint. This version includes notations made by Plaintiff onto the Policy. (Dkt No. 1, Ex. 4, Severance Policy.) Plaintiff testified that the January 2012 Severance Policy was the latest version of the Severance Policy in the online Employee Policy Center when he accessed the Severance Policy in March or April of 2014. (O'Brien Dep. 35:17-36:16; Pl. Resp. to Def. SOF ¶ 14.) Given the filings, the Court will refer to the October 2012 version of the Severance Policy.

Ruehl Dep.];[2] Def. SOF ¶ 16; Pl. Resp. to Def. SOF ¶ 16; Pl. SOF ¶ 14; Def. Resp. to Pl. SOF ¶ 14.) To access the Severance Policy, an employee has to access Defendant's online center, navigate through a series of screens, and search for the specific phrase "severance policy" in the search window. (Online Screenshots at DEF223-26; Ruehl Dep. 11:12-19; Def. SOF ¶ 17; Pl. Resp. to Def. SOF ¶ 17.) The Policy Manual's section "How to Find Information on Employee Benefits, Guidelines and More" does not explain to employees how to locate the Severance Policy. (Policy Manual at 58-61; Def. SOF ¶ 13; Pl. Resp. to Def. SOF ¶ 13.) However, as previously noted, the Policy Manual's Introduction did provide information about the online Employee Policy Center where the Severance Policy is located. (Policy Manual at 1; Pl. Resp. to Def. SOF ¶ 13.)

The Severance Policy does not include an acknowledgment for employees to sign, and there is no requirement, or way, for employees to electronically acknowledge receipt of the Severance Policy. (Severance Policy; Ruehl Dep. 11:8-25; Def. SOF ¶ 13; Pl. Resp. to Def. SOF ¶ 13.) No employee of Defendant told Plaintiff that the Policy was a contract between Plaintiff and Defendant. (O'Brien Dep. 92:2-13; Def. SOF ¶ 19; Pl. Resp. to Def. SOF ¶ 19.) At his deposition, Plaintiff stated that his understanding was that the Severance Policy was "not a contract, but an understanding as an employee." (O'Brien Dep. 52:11-19; Def. SOF ¶ 20; Pl. Resp. to Def. SOF ¶ 20.)

Defendant periodically revises its Severance Policy. (Ruehl Dep. 11:3-7; Def. SOF ¶ 14; Pl. Resp. to Def. SOF ¶ 14.) Defendant does not confer with its employees prior to making changes to its Severance Policy and does not notify its employees of those changes. (Ruehl Dep.

---

[2] In their Motion for Summary Judgment, Defendant provided selected portions of Ms. Ruehl's deposition. In his Response to Defendant's Motion, Plaintiff cites to additional portions of the Deposition and attached these additional citations at Dkt No. 34, Ex. B. When referring to Ms. Ruehl's deposition, the Court provides pin-cite citations to the deposition transcript.

11:8-25; O'Brien Dep. 14:18-15:5; Def. SOF ¶ 14; Pl. Resp. to Def. SOF ¶ 14.)

Defendant never gave Plaintiff a hard copy of the Severance Policy. (O'Brien Dep. 25:4-10; Def. SOF ¶ 18; Pl. Resp. to Def. SOF ¶ 18.) The first time Plaintiff accessed Defendant's Severance Policy for "his own purposes" was in March or April of 2014. (O'Brien Dep. 37:3-6; Def. SOF ¶ 21; Pl. Resp. to Def. SOF ¶ 21.) The latest version of the Severance Policy available on the online Employee Policy Center at that time was the January 2012 Severance Policy. (O'Brien Dep. 27:1-10; Def. SOF ¶ 22; Pl. Resp. to Def. SOF ¶ 22; Pl. SOF ¶ 16; Def. Resp. to Pl. SOF ¶ 16.)[3] Plaintiff does not recall whether he looked at the Severance Policy for his sales team prior to his searching for it on March or April of 2014. (O'Brien Dep. 24:18-25:3, 36:17-37:7; Pl. Resp. to Def. SOF ¶ 21; Pl. SOF ¶ 15; Def. Resp. to Pl. SOF ¶ 15.)

The Severance Policy states that "the document outlines Fifth Third Bank's ('Fifth Third') policy regarding severance benefits." (Severance Policy at 1; Def. SOF ¶ 23; Pl. Resp. to Def. SOF ¶ 23.) The Severance Policy states:

> **Policy.** There may be times when Fifth Third's success is dependent upon streamlining operations or creating efficiencies by eliminating positions…Pay and benefits offered through Fifth Third's Severance Policy are provided in an effort to assist departing employees as they transition to a new position outside of Fifth Third and to minimize the risk to Fifth Third as a result of these reductions.
>
> ****
>
> **Eligibility.** An employee may be eligible for severance pay if the employee is in active or inactive status (on approved leave), is either a full-time or part-time employee of Fifth Third who has qualifying termination, and meets the conditions for receipt of severance pay….
>
> ****
>
> **Qualifying Separations.** Severance pay is available for the following

---

[3] The Court clarifies for the record that the January 2012 Severance Policy was not attached to Plaintiff's Complaint. Plaintiff attached the October 2012 Severance Policy. As previously explained *supra* in note 1, the Court will analyze the October 2012 Severance Policy.

terminations of employment circumstances: a reduction-in-workforce; position elimination; or re-organization. Eligibility and qualification determinations will be made by an appropriate Employee Relations Department representative, in consultation with Legal and the appropriate line of business and/or affiliate representative(s). Fifth Third has sole discretion to determine whether an individual is eligible and/or qualified to receive severance pay under this policy.

\*\*\*\*

**Non-Qualifying Separations.** Severance pay is not normally available for termination of employment including but not limited to the following circumstances: voluntary termination…for any reason that management determines is not qualifying termination; when a comparable internal transfer…is made…Management reserves the right to provide severance pay for legitimate business reasons.

\*\*\*\*

**Conditions of Payment.** …If an employee's position is eliminated, the employee may be encouraged and expected to pursue other opportunities within the Bank for which they may qualify. An employee is not eligible for severance pay if a comparable job offer is extended and declined.

(Severance Policy ¶¶ 1-3, 6; Def. SOF ¶¶ 24-27; Pl. Resp. to Def. SOF ¶¶ 24-27; Pl. SOF ¶ 17-18; Def. Resp. to Pl. SOF ¶¶ 17-18.) Plaintiff understood that there were categories of people who would not under any circumstances receive severance pay. (O'Brien Dep. ¶ 39:9-40:23; Def. SOF ¶ 28; Pl. Resp. to Def. SOF ¶ 28.)

### c.   Plaintiff's Termination

In 2014, Defendant was going through a reorganization process in its Consumer Lending Division. (Dkt No. 34, Ex. G, Non-delegated Correspondence Channel Powerpoint, May 2014 at DEF235 [hereinafter HR Powerpoint]; Dkt No. 34, Ex. K, March 6, 2014 Emails; Pl. SOF ¶¶ 21, 25; Def. Resp. to Pl. SOF ¶¶ 21, 25.) On March 10, 2014, Bob Lewis, Senior Vice President and Head of Mortgage, wrote via email to Defendant's employees, including Plaintiff, that Defendant was exiting the mortgage-wholesale business. (Dkt No. 28, Ex. H, March 10, 2014 Exit Announcement [hereinafter Exit Announcement]; Def. SOF ¶¶ 30, 32; Pl. Resp. to Def. SOF ¶

30, 32; Pl. SOF ¶¶ 34-35; Def. Resp. to Pl. SOF ¶ 34-35.)

On March 10, 2014, Defendant fired a RSM and provided him with severance. (Ruehl Dep. 56:3-57:6; Dkt No. 34, Ex. K, Manager Script – Discussion with Impacted Employees at DEF249 [hereinafter Man. Script]; Def. SOF ¶ 34; Pl. Resp. to Def. SOF ¶ 34; Pl. SOF ¶¶ 37-38; Def. Resp. to Pl. SOF ¶ 37-38.) On March 10, 2014, three Account Executives were also let go. (Ruehl Dep. 21:19-21:25; Pl. Resp. to Def. SOF ¶ 33; Pl. SOF ¶¶ 20, 37; Def. Resp. to Pl. SOF ¶¶ 20, 37.) After March 10, 2014, there were four RSMs remaining who were all going to be transitioned to positions as Correspondent Sales Managers ("CSM"). (Ruehl Dep. 22:19-24.)

Plaintiff understood that he could continue as an employee with Defendant if he transitioned to the CSM role. (O'Brien Dep. 62:13-19, 65:3-20; Pl. Resp. to Def. SOF ¶ 47.) As a result of Defendant's decision to exit the mortgage-wholesale business, approximately thirty, out of the fifty, Account Executives resigned and did not receive severance. (HR Powerpoint at DEF235-36; Ruehl Dep. 31:2-24; Def. SOF ¶ 40; Pl. Resp. to Def. SOF ¶ 40; Pl. SOF ¶ 46; Def. Resp. to Pl. SOF ¶ 46.)

At this time, Tom Booth was the Senior Vice President National Wholesale Channel Manager and the direct supervisor of Plaintiff and the other RSMs. (Booth Dep. 9:10-14; Ruehl Dep. 32:19-24; Pl. SOF ¶ 22; Def. Resp. to Pl. SOF ¶ 22.) Mr. Booth never intended to communicate to Plaintiff that his employment with Defendant was terminating. (Dkt No. 28, Ex. B, John Thomas Booth Dep., 32:23-33:2, 33:21-24, Jan. 23, 2015 [hereinafter Booth Dep.];[4] Def. SOF ¶ 47; Pl. Resp. to Def. SOF ¶ 47.) Mr. Booth wanted Plaintiff to transition to the role of CSM. (O'Brien Dep. 70:12-15; Booth Dep. 50:14-23; Def. SOF ¶ 47; Pl. Resp. to Def. SOF ¶

---

[4] In their Motion for Summary Judgment, Defendant provided selected portions of Mr. Booth's deposition. In his Response to Defendant's Motion, Plaintiff cites to additional portions of the Deposition and attached these additional citations at Dkt No. 34, Ex. H. When referring to Mr. Booth's deposition, the Court provides pin-cite citations to the deposition transcript.

47.) No employee at Defendant ever told Plaintiff that he was fired or that he was being terminated from the company. (O'Brien Dep. 58:13-18.)

The CSM role had the same base salary and commission structure as the RSM role. (Ruehl Dep. 24:20-25:5; Def. SOF ¶ 36; Pl. Resp. to Def. SOF ¶ 36.) That said, Plaintiff believed that he would make roughly half of his annual commissions compared to his prior position as a RSM. (O'Brien Dep. 65:21-67:19; Dkt No. 34, Ex. J, Pl. Resp. to Interrogatories ¶ 18 [hereinafter Pl. Inter. Resp.]; Pl. Resp. to Def. SOF ¶ 37; Pl. SOF ¶ 60; Def. Resp. to Pl. SOF ¶ 60.) The parties dispute whether other responsibilities of the CSM role were similar to the RSM role. It is undisputed that Plaintiff had lost members of his prior team, the amount of time it would take to get to a certain level of production would be longer than it was as a RSM, and the industry generally was a smaller segment than what Plaintiff had been building and managing. (O'Brien Dep. 86:5-19; Booth Dep. 46:7-15; Def. SOF ¶ 41; Pl. SOF ¶¶ 31, 61; Def. Resp. to Pl. SOF ¶ 31, 61.)

Prior to the transition's completion, Defendant offered the former RSMs a three month transition compensation plan. (Ruehl Dep. 23:1-24:19; Def. SOF ¶ 37; Pl. Resp. to Def. SOF ¶ 37.) Defendant offered these employees a guaranteed $3,000 monthly, and the opportunity to earn $5,000 monthly if the employee signed up a specified number of new, approved correspondents. (O'Brien Dep. 79:13-17; Ruehl Dep. 25:6-21; Def. SOF ¶ 38; Pl. SOF ¶ 63; Def. Resp. to Pl. SOF ¶ 63.) Plaintiff was aware of the transition plan. (O'Brien Dep. 77:18-15; Def. SOF ¶ 39; Pl. Resp. to Def. SOF ¶ 39; Pl. SOF ¶ 64; Def. Resp. to Pl. SOF ¶ 64.)

Plaintiff decided to leave Defendant "within probably 30 to 45 days from the March 10th announcement." (O'Brien Dep. 50:1-8; Def. SOF ¶ 42; Pl. Resp. to Def. SOF ¶ 42.) Plaintiff determined that "it would be very difficult…to be able to support [his] family in the new

business line that they were attempting to build." (O'Brien Dep. 50:5-8; Pl. Inter. Resp. ¶ 11; Booth Dep. 28:16-31:10; Def. SOF ¶ 43; Pl. Resp. to Def. SOF ¶ 43; Pl. SOF ¶ 67; Def. Resp. to Pl. SOF ¶ 67.) In April 2014, Plaintiff began discussions with his current employer about alternative employment. (O'Brien Dep. 47:11-13; Def. SOF ¶ 44; Pl. Resp. to Def. SOF ¶ 44.)

On or about April 28, 2014, Plaintiff advised Mr. Booth that he would not be attending the upcoming sales meeting because he planned to leave Defendant. (Booth Dep. 29:7-12; Def. SOF ¶ 45; Pl. Resp. to Def. SOF ¶ 45; Pl. SOF ¶ 67; Def. Resp. to Pl. SOF ¶ 67.) Plaintiff told Mr. Booth that he had better opportunities elsewhere, or something to that effect. (Booth Dep. 29:14-18; Def. SOF ¶ 45; Pl. Resp. to Def. SOF ¶ 45.) Specifically, Plaintiff noted that Defendant's decision to exit the Mortgage Wholesale business left Plaintiff without the responsibility of recruiting, hiring or managing Wholesale account executives, or developing wholesale mortgage broker relationships. (Pl. Inter. Resp. ¶ 11; Pl. Resp. to Def. SOF ¶ 45; Pl. SOF ¶ 67; Def. Resp. to Pl. SOF ¶ 67.) Further, Plaintiff advised Mr. Booth that non-delegated correspondent lending was not a viable business. (Pl. Inter. Resp. ¶ 11; Pl. Resp. to Def. SOF ¶ 45; Pl. ¶ 67; Def. Resp. to Pl. SOF ¶ 67.)  Mr. Booth requested that Plaintiff send Plaintiff's notice in writing. (Booth Dep. 31:5-7; Def. SOF ¶ 45; Pl. Resp. to Def. SOF ¶ 45.)

On May 1, 2014, Plaintiff sent an email to Mr. Booth, Meaghan Ruehl, Vice President of Employee Relations Advisor, and Bob Lewis, former President, advising them that he was leaving the company on May 9, 2014. (Dkt No. 28, Ex. J, May 1, 2014 Email from Plaintiff [hereinafter Pl. Email]; Def. SOF ¶ 46; Pl. Resp. to Def. SOF ¶ 46; Pl. SOF ¶ 68; Def. Resp. to Pl. SOF ¶ 68.) Plaintiff's email states:

> ….I will be departing 53rd Bank, due to our Organizational Announcement of 3/10/2014 from Bob Lewis which communicated 53rd Bank's decision to "exit the Wholesale business". This announcement effectively eliminated my position as Vice President, Wholesale Regional Sales Manager for the Northeast. My

responsibilities of recruiting, hiring and managing Wholesale Account Executives as well as developing quality Mortgage Broker relationships to fund high quality Wholesale production has been eliminated. The offer to build and manage new sales personnel to sell mini correspondent or non delegated loan production form a new set of lender clients is a new position (as well as title) that I cannot afford to accept. As you know the overall compensation package for the new Correspondent Sales Manager position is a much lower income level than our previous Wholesale Sales Manager due to the reduction in qualified accounts that can be cultivated. Industry reporting has placed "mini correspondent" or non delegated production flow at approximately 10% of all Broker Wholesale production. Due to these documented facts of the communicated exit and new strategy I respectfully request a severance package from 53rd Bank based on the elimination of my position and 5.8 years of successful, loyal service to our Wholesale Lending division of 53rd Mortgage. Regardless of HR and Legal's ultimate response to the above request, I intend on remaining with the Bank until Friday, May 9th, 2014.

(Pl. Email; Def. SOF ¶¶ 46, 50; Pl. Resp. to Def. SOF ¶ 46, 50; Pl. SOF ¶¶ 56, 68; Def. Resp. to Pl. SOF ¶¶ 50, 67.)

Mr. Booth spoke with Ms. Ruehl about Plaintiff's request for severance; he summarized the request and alerted Ms. Ruehl that he had told Plaintiff that the matter was referred to her. (Booth Dep. 34:11-18; Ruehl Dep. 43:15-44:15; Def. SOF ¶ 51; Pl. Resp. to Def. SOF ¶ 51.) Ms. Ruehl's recommendation was to deny Plaintiff's request for severance upon her belief that Plaintiff was voluntarily resigning his position. (Ruehl Dep. 44:11-15; Def. SOF ¶ 52; Pl. Resp. to Def. SOF ¶ 52.)

As of May 9, 2014, only three of the Account Executives who formerly reported to Plaintiff remained with Defendant. (Def. Inter. Resp. ¶ 6; Pl. SOF ¶ 57; Def. Resp. to Pl. SOF ¶ 57.) On May 9, 2014, Chad Borton, newly installed head of the Consumer Bank at Fifth Third, met with Ms. Ruehl to discuss the transition from mortgage-wholesale to correspondent and the future of the correspondent channel. (Dkt No. 34, Ex. L, Executive Communication from the Desk of Chad Borton at DEF229 [hereinafter Bolton Email]; HR Powerpoint; Ruehl Dep. 66:2-67:3, 69:1-16; Def. SOF ¶¶ 55-57; Pl. Resp. to Def. SOF ¶ 55-57; Pl. SOF ¶¶ 43, 45; Def. Resp.

to Pl. SOF ¶¶ 43, 45.)

Plaintiff's final day at Defendant was May 12, 2014. (O'Brien Dep. 50:9- 51:1; Def. SOF ¶ 53; Pl. Resp. to Def. SOF ¶ 53.) On that day, Plaintiff had "confirmed and acknowledged" a new position with his current employer. (O'Brien Dep. 51:2-6; Def. SOF ¶ 53; Pl. Resp. to Def. SOF ¶ 53.)

Following the May 9, 2014 meeting, in mid-May, Mr. Borton concluded that the remaining Account Executives and three non-RSM managers would be brought inside the existing delegated Correspondent Chanel. (Dkt No. 34, Ex. M, Organizational Announcement, May 30, 2014 at DEF217 [hereinafter May 30th Announcement]; Dkt No. 34, Ex. N, May 20, 2014 Emails at DEF 231-32; Ruehl Dep. 67:4-17; Pl. SOF ¶¶ 44, 47; Def. Resp. to Pl. SOF ¶¶ 44, 47.) Mr. Borton also decided that the three remaining RSMs were to be fired. (Ruehl Dep. 48:1-15, 67:4-17; Pl. SOF ¶ 49; Def. Resp. to Pl. SOF ¶ 49.)

On May 28, 2014, the remaining remote-based RSMs, like Plaintiff had been, were terminated and provided with severance. (Ruehl Dep. 45:24-46:8; Def. SOF ¶ 58; Pl. SOF ¶¶ 20, 51; Def. Resp. to Pl. SOF ¶¶ 20, 51.) These terminations effectively removed a layer of management from Defendant, the layer of which Plaintiff had previously been part. (Ruehl Dep. 48:1-15; Pl. SOF ¶¶ 49, 51; Def. Resp. to Pl. SOF ¶¶ 49, 51.) On May 29, 2014, Mr. Booth notified the three remaining RSMs that their positions had been eliminated and that they would receive severance. (Ruehl Dep. 46:9-19; Pl. SOF ¶ 52; Def. Resp. to Pl. SOF ¶ 52.)

On May 30, 2014, Defendant announced that it would be eliminating the CSMs and that there would instead be a single leader over the correspondent channel. (May 30th Announcement; Def. SOF ¶ 58; Pl. Resp. to Def. SOF ¶ 58; Pl. SOF ¶¶ 44, 53; Def. Resp. to Pl. SOF ¶¶ 44, 53.)

### III.    Discussion

#### a.  The Severance Policy is not an enforceable contract.

##### i.  Legal Standard

The Court will apply Pennsylvania contract-law principles to determine whether the Severance Policy constitutes a contract. *See Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 514, 533 (3d Cir. 2009) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "In general, to determine whether a contract was formed under Pennsylvania law, a court must look to: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms are sufficiently definite to be enforced; and (3) whether there was consideration." *Century Indem. Co.*, 584 F.3d at 533 (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)). Provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties. *Bauer v. Pottsville Area Emergency Medical Services, Inc.*, 758 A.2d 1265, 1269 (2000) (internal citations omitted); *Sharp v. Whitman Council, Inc.*, 2006 WL 2261623, at *23 (E.D. Pa. 2006) (citing *Bauer*); *Caucci v. Prison Health Servs., Inc.*, 153 F. Supp. 2d 605, 611 (E.D. Pa. 2001) (same); *see also Morosetti v. La. Land & Exploration Co.*, 564 A.2d 151, 152 (Pa.1989) ("A handbook [or other policy statement] distributed to employees as inducement for employment may be an offer and its acceptance a contract.").

However, "The court may not presume that the employer intended to be bound legally by distributing the handbook nor that the employee believed that the handbook was a legally binding instrument." *Caucci*, 153 F. Supp. 2d at 611 (citing *Luteran v. Loral Fairchild Corp.*, 455 Pa.Super. 364, 688 A.2d 211, 214–15 (1997)). An employment manual or policy may only be deemed a binding contract where the benefit was extended at the time of hire and where there is evidence by which a reasonable person would conclude that the employer intended to be

13

bound by its terms. *Garcia v. Matthews,* 66 Fed. Appx. 339, 342 (3d Cir. 2003) (non-precedential) (citing *Bauer,* 758 A.2d at 1269); *accord Raines v. Haverford College*, 849 F. Supp. 1009, 1012 (E.D. Pa. 1994) (citing *Ruzicki v. Catholic Cemeteries Assoc. of Diocese of Pittsburgh*, 610 A.2d 495, 497 (Pa. Super. 1992) (quoting *Scott v. Extracorporeal, Inc.*, 376 Pa. Super. 90, 96, 545 A.2d 334, 337 (1988))). It is a decision left to the Court "to interpret the handbook to discern whether it contains evidence of the employer's intention to be legally bound." *Ruzicki*, 416 Pa. Super. at 42, 610 A.2d at 497 (citing *Scott,* 545 A.2d at 337)).

First, for a handbook to be considered part of a contract, it "must be distributed to employees as inducement for employment as part of an offer." *Botwe-Asamoah v. University of Pittsburgh*, 2013 WL 5806464, at *5 (W.D. Pa. 2013) (citing *Morosetti*, 564 A.2d at 152).

Second, to determine whether a reasonable person would conclude that the employer intended to be bound by the terms of the policy at issue, the Court must analyze the policy at issue. An employer's intent cannot be proved "by bits and pieces of their policy given individual employees at different times under varying circumstances." *Morosetti*, 564 A.2d at 152-53. Lack of intent can be shown where a company unilaterally revises the policy. *Richardson v. Charles Cole Memorial Hosp.*, 466 A.2d 1084, 1085 (Pa. Sup. Ct. 1983).

Generally, explicit disclaimers of contract formation in a policy "preclude a breach of contract claim."[5] *Caucci*, 153 F. Supp. 2d at 611 (citing *Landmesser v. United Air Lines, Inc.,*

---

[5] The Court notes that this case law relates to the at-will presumption. "The [at-will presumption] doctrine does not, however, address other aspects of the employment arrangement, such as issues regarding the promised form and amount of compensation for work completed prior to an employee's termination." *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 941-42 (Pa. Super. 2011) (quoting *McGough v. Broadwing Commc'ns, Inc.,* 177 F.Supp.2d 289 (D.N.J.2001) (applying Pennsylvania law)). "An employer who offers various rewards to employees who achieve a particular result or work a certain amount of overtime, for example, may be obligated to provide those awards to qualifying employees, although retaining the right to terminate them for any or no reason." *Pilkington v. CGU Ins. Co.*, 2000 WL 33159253, at *6 (E.D. Pa. 2001) (citing *Donahue v. Federal Exp. Corp.,* 753 A.2d 238, 242 (Pa. Super. 2000)). Thus, the Court does not cite these cases for the proposition that the existence of the at-will

102 F.Supp.2d 273, 280 (E.D. Pa. 2000)); *see, e.g., Botwe-Asamoah*, 2013 WL 5806464, at *5 (dismissing breach of contract claim where handbook stated "the language used in this Handbook is not intended to create a contract between the University of Pittsburgh and its employees"); *Makara v. Albert Einstein Healthcare Network*, 2009 WL 1011753, at *4 (E.D. Pa. 2009) (same, "Neither the handbook nor any policies referred to in this handbook shall be construed as a contract or as conferring any contractual rights"); *Landmesser*, 102 F. Supp. 2d at 280 (same, "[t]hese regulations do not constitute an employment contract…."); *Raines*, 849 F. Supp. at 1012 (same, "handbook of course is not a contract of employment, but it is intended to serve as an introduction and guide to expectations at [Defendant]" invalidated any contract claim); *see also Ruzicki,* 610 A.2d at 496; *Rutherford v. Presbyterian–Univ.,* 417 Pa.Super. 316, 612 A.2d 500 (Pa. Super. 1992).

### ii.  Analysis

The Court finds that as a matter of law, based on the material, undisputed facts at issue in this case, the Severance Policy is not an enforceable contract.

First, generously construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff did receive the Severance Policy at the outset of his employment. It is undisputed that Defendant never gave Plaintiff a hard copy of the Severance Policy, either at the start of his employment or during his employment. (O'Brien Dep. 25:4-10; Def. SOF ¶ 18; Pl. Resp. to Def. SOF ¶ 18.) The first time Plaintiff accessed Defendant's Severance Policy for his own purposes was in March or April of 2014, years after his initial employment. (O'Brien Dep. 37:3-6; Def. SOF ¶ 21; Pl. Resp. to Def. SOF ¶ 21.) The Severance Policy does not include an

---

presumption necessarily invalidates Plaintiff's rights to severance pay from an otherwise enforceable contract. The Court does cite these cases for legal standards on how to determine if an employer policy is in fact an enforceable contract.

acknowledgment for employees to sign, and there is no requirement, or way, for employees to electronically acknowledge receipt of the Severance Policy. (Severance Policy; Ruehl Dep. 11:8-25; Def. SOF ¶ 13; Pl. Resp. to Def. SOF ¶ 13.)

However, the Policy Manual was given to Plaintiff at the time of his employment, and every year thereafter. (O'Brien Dep. 13:1-6, 14:16-20, 19:5-9; Def. SOF ¶ 7; Pl. Resp. to Def. SOF ¶ 7; Pl. SOF ¶ 8; Def. Resp. to Pl. SOF ¶ 8.) The Policy Manual notifies employees that additional policies may be available at the online Employee Policy Center. (Policy Manual at 1; Pl. SOF ¶¶ 11-12; Def. Resp. to Pl. SOF ¶¶ 11-12.) The Severance Policy is contained in Defendant's online Employee Policy Center. (Online Screenshots at DEF223-26; Ruehl Dep. 11:12-19; Def. SOF ¶ 16; Pl. Resp. to Def. SOF ¶ 16; Pl. SOF ¶ 14; Def. Resp. to Pl. SOF ¶ 14.) Thus, generously construing the facts in the light most favorable to Plaintiff, the Severance Policy was given to Plaintiff at his employment by way of the Policy Manual.

Second, however, based on the undisputed facts, the Court cannot find that a reasonable employee would consider the Severance Policy to be an enforceable contract. As a preliminary matter, Plaintiff, arguably a prototypical "reasonable employee," did not even think that the Severance Policy was a contract. (O'Brien Dep. 52:11-19; Def. SOF ¶ 20; Pl. Resp. to Def. SOF ¶ 20.) While Plaintiff's subjective belief is not part of the Court's analysis, the Court finds it appropriate to reiterate this fact as a background point.

The Court finds that the Severance Policy was not an enforceable contract because the Policy contained an explicit disclaimer, Defendant unilaterally revised the Policy during Plaintiff's employment, and Defendant's actions did not reasonably communicate that the Severance Policy was an enforceable contract.

First, the Policy Manual explicitly disclaims that its policies and procedures are a

contract. (Policy Manual at 1; Def. SOF ¶ 10; Pl. Resp. to Def. SOF ¶ 10.) The Policy Manual

states:

> The policies and procedures in this policy manual are designed to serve as
> guidelines for management action. They are not intended to create any contract or
> binding agreement between Fifth Third Bank and any employee. All policies and
> procedures outlined in this Policy Manual are subject to change at Fifth Third's
> discretion at any time, with or without notice.

(Policy Manual at 1; Def. SOF ¶ 10; Pl. Resp. to Def. SOF ¶ 10.) The Severance Policy itself

does not contain any such disclaimer. However, if the Court construes that the Severance Policy

was explicitly offered to Plaintiff at the time of his employment via the Policy Manual, then the

Policy Manual's explicit disclaimer that the policies in the Policy Manual, inclusive of the

policies on the online Employee Policy Center, may also be imputed to the Severance Policy.

The explicit disclaimer weighs heavily against a reasonable employee believing that his or her

employer intended to be bound to this Policy. *See, e.g.*, *Landmesser,* 102 F.Supp.2d at 280.

Second, Defendant unilaterally revised the Severance Policy multiple times. (Ruehl Dep.

11:8-25; O'Brien Dep. 14:18-15:5; Def. SOF ¶ 14; Pl. Resp. to Def. SOF ¶ 14.) The fact that

Defendant could, and did, unilaterally, revise the contract demonstrates that the terms of the

Severance Policy were not appropriately definite for a reasonable employee to construe the

Policy as a promise by the employer to be bound by it. *See, e.g.*, *Richardson*, 466 A.2d at 1085.

Third, the record is undisputed that Defendant never communicated to Plaintiff, or to any

employee, that the Severance Policy was a contract. (O'Brien Dep. 92:2-13; Def. SOF ¶ 19; Pl.

Resp. to Def. SOF ¶ 19.) Plaintiff argues that the Court should compare this case to *Braun v.*

*Wal-Mart Stores*. (Pl. Resp. at 12.) In *Braun*, the employees "were told [by the employer] from

day one in orientation that they were supposed to get [the relevant compensation from the

handbook]" and that the employer "reinforced" the relevant handbook policy with "corporate-

wide policies and orientation sessions in which the handbook was disseminated and signed for."
24 A.3d at 944-45.

In contrast, in this case, there is no evidence that Defendant discussed the Severance
Policy with Plaintiff prior to Plaintiff's announcement that he was leaving Defendant. Defendant
never required or sought any confirmation that its employees reviewed, or were even aware of,
the Severance Policy. (Severance Policy; Ruehl Dep. 11:8-25; Def. SOF ¶ 13; Pl. Resp. to Def.
SOF ¶ 13.) The Policy Manual does not list the Severance Policy in the Policy Manuals' list of
forty-eight additional policies index. (Policy Manual at 58-61; Def. SOF ¶ 13; Pl. Resp. to Def.
SOF ¶ 13.) That said, employees had to sign for the Policy Manual, the Policy Manual informed
employees that there were additional policies on the Employee Policy Center, and the Employee
Policy Center contained the Severance Policy following a specific search by the employee of the
phrase "severance policy." (Online Screenshots at DEF223-26; Ruehl Dep. 11:12-19; Def. SOF ¶
17; Pl. Resp. to Def. SOF ¶ 17.) The factual scenario in this case is hardly a comparator to the
facts in *Braun* where the relevant policy at issue was explicitly discussed at orientation, given out
at subsequent trainings, and signed for explicitly by employees.

Further, Plaintiff argues that the fact that Defendant adhered to the Severance Policy with
other RSMs is proof a reasonable person in Plaintiff's position would understand that his
continued performance would bear the fruits of the Severance Policy. (Pl. Resp. at 6.) In support
of this proposition, Plaintiff cited to *Andrews v. CompUSA*, 2002 WL 2650897 (N.D. Texas
2002) (applying Pennsylvania law). (Pl. Resp. at 6.) *Andrews* is clearly distinguishable from this
case. In *Andrews*, there was deposition testimony that the employer created the relevant
commission policy to motivate its employees and that the employer knew that its employees
expected to "be paid in accordance with the plan." 2002 WL 2650897, at *7. There is no such

testimony in this case. Moreover, the types of payment schemes at issue are wildly different. In *Andrews*, there was evidence that the commission scheme was enacted to encourage employees to pursue larger national clients, and evidence that this policy influenced employee's behavior. *Id.* In this case, there is no evidence that Plaintiff, or any other employee, continued to work, or changed their work behavior (e.g. work hours, responsibilities, etc.) for Defendant because of the Severance Policy. Such motivation would of course be highly unlikely as Plaintiff stated in his deposition that he only accessed the Severance Policy for his personal use after six years with Defendant and at roughly the same time that he decided to resign.

In conclusion, the Court finds that there are no material, disputed issues of fact, and that the facts construed in the light most favorable to Plaintiff do not support a claim that the Severance Policy is a contract.

      **b. Even if the Severance Policy were a contract, Plaintiff voluntarily resigned and thus would not be due compensation under the Severance Policy.**

As a preliminary matter, if the Severance Policy were a contract – which the Court finds it is not – any analysis as to amounts owed to Plaintiff under the Policy would sound in contract law. The Court notes that in support of his position, Plaintiff cites to many cases regarding employment discrimination and the standard for constructive discharge following a hostile work environment or other adverse employment action. Defendant cites to many cases regarding ERISA plans. The Court notes that none of these cases are directly on point for the Court's analysis herein. The question for the Court is whether, if the Severance Policy was a contract, Plaintiff could be due severance pay under the terms of the Severance Policy. This is solely a question of contractual interpretation.

Under the plain language of the Severance Policy, severance pay "is available for the

following terminations of employment circumstances.....position elimination; or reorganization."
(Severance Policy ¶ 2.) However, the Severance Policy clarifies that severance pay is "not
normally available for termination of employment including....when a comparable internal
transfer...is made…" (Severance Policy ¶ 3.) The Severance Policy specifically notes that "if an
employee's position is eliminated, the employee may be encouraged and expected to pursue
other opportunities within the Bank for which they may qualify. An employee is not eligible for
severance pay if a comparable job offer is extended and decline." (Severance Policy ¶ 6.)
Further, Defendant asserts that it has "sole discretion to determine whether an individual is
eligible and/or qualified to receive severance pay under this policy." (Severance Policy ¶ 2.)

It is not disputed that Plaintiff's position was "eliminated" as defined in paragraph two of
the Severance Policy. However, Plaintiff was never "terminated" from Defendant as defined in
paragraph two. Defendant never told Plaintiff that he was fired or that he was being terminated
from the company. (O'Brien Dep. 58:13-18.) His supervisor, Mr. Booth, never communicated
that Plaintiff was fired, and in fact, Mr. Booth did not want to fire Plaintiff. (Booth Dep. 32:23-
33:2, 33:21-24, 50:14-23; O'Brien Dep. 70:12-15; Def. SOF ¶ 47; Pl. Resp. to Def. SOF ¶ 47.)
At the time he gave notice, Plaintiff understood that he could continue as an employee with
Defendant if he transitioned to the CSM role. (O'Brien Dep. 62:13-19; 65:3-20; Pl. Resp. to Def.
SOF ¶ 47.) Thus, even under paragraph two, the Court cannot find that Plaintiff is eligible for
severance.

Plaintiff argues that he was "terminated" insofar as his RSM position was "terminated,"
regardless of the CSM transition offer. This definition of "termination" does not sound under the
Severance Policy's "Policy" section. Under "Policy," the Severance Policy explains that "Pay
and benefits offered through Fifth Third's Severance Policy are provided in an effort to assist

departing employees as they transition to a new position outside of Fifth Third and to minimize the risk to Fifth Third as a result of these reductions." (Severance Policy ¶ 1.) The Court finds that the plain language of the Severance Policy assumes that a "termination" is necessarily to a "new position *outside* of Fifth Third…" (Severance Policy ¶ 1) (emphasis added). Thus, because the elimination of the RSM role was announced in conjunction with an offer to transition to a new position *inside* of Fifth Third, the elimination of the RSM role is not a "termination" as defined by the Severance Policy.

Moreover, the Court finds that the Severance Policy explicitly reserved Defendant's "sole discretion to determine whether an individual is eligible and/or qualified to receive severance pay under this policy." (Severance Policy ¶ 2.) Under Plaintiff's request for severance, Ms. Ruehl, as an agent of Defendant, suggested denial because of her understanding that Plaintiff had voluntarily resigned. (Ruehl Dep. 44:11-15; Def. SOF ¶ 52; Pl. Resp. to Def. SOF ¶ 52.) The Court finds that Ms. Ruehl's interpretation was correct as to the content of paragraph two and that she as an agent of Defendant was within her discretion to make such a suggestion under paragraph two.

Further, even if Plaintiff's claim survived paragraph two, the Court further finds that the CSM role was "comparable" because it had the same base salary and commission structure as the RSM role. (Ruehl Dep. 24:20-25:5; Def. SOF ¶ 36; Pl. Resp. to Def. SOF ¶ 36.) Thus, Plaintiff's "termination" was not eligible for severance pay because a comparable position was available within Defendant. (Severance Policy ¶¶ 3, 6.)

## IV.    Conclusion

Both Count I and Count II rely on a finding that Defendant breached its contractual duties to Plaintiff under the Severance Policy. Given that the Court has found that there was no

contract, and that no duty has been breached, both claims are hereby DISMISSED.

BY THE COURT:

/s/ C. Darnell Jones, II

_____

C. Darnell Jones, II     J.